## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP  DIVISION

| | | |
|---|---|---|
| **GARY WAYNE JACKSON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:12CV00008 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CAROLYN W. COLVIN, ACTING** | ) | By:  James P. Jones |
| **COMMISSIONER OF SOCIAL** | ) | United States District Judge |
| **SECURITY,**[1] | ) | |
| | ) | |
| Defendant. | ) | |

*Vernon M. Williams, Wolfe Williams Rutherford & Reynolds, Norton, Virginia, for Plaintiff.  Eric P. Kressman, Regional Chief Counsel, Region III, Elizabeth A. Corritore, Assistant Regional Counsel, and Alexander L. Cristaudo, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania.*

In this social security case, I affirm the decision of the Commissioner.

I

Plaintiff Gary Wayne Jackson filed this claim challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability insurance benefits ("DIB") pursuant to Title II of the Social Security

---

[1]  Carolyn W. Colvin became the Acting Commissioner on February 14, 2013, and is substituted for Michael J. Astrue as the defendant in this suit pursuant to Fed. R. Civil P. 25(d).

Act (the "Act"), 42 U.S.C.A. §§ 401-434 (West 2011 & Supp. 2013). Jurisdiction of this court exists under 42 U.S.C.A. § 405(g).

Jackson protectively applied for DIB benefits on April 16, 2008, alleging disability beginning on January 26, 2008. He met the insured status requirements through December 31, 2011. Jackson's claim was denied initially and upon reconsideration. A hearing was held before an administrative law judge ("ALJ") on February 9, 2010, at which Jackson, represented by counsel, and a vocational expert ("VE") testified. On March 5, 2010, the ALJ issued a decision denying Jackson's claim. The Appeals Council denied Jackson's request for review, thereby making the ALJ's decision the final decision of the Commissioner. Jackson then filed the Complaint in this court seeking judicial review of the Commissioner's decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is now ripe for decision.

II

Jackson alleged disability due to sleep apnea, hearing loss, back and knee problems, depression, and anxiety. Jackson was 50 years old on the alleged disability onset date, making him a "person closely approaching advanced age" under the regulations. 20 C.F.R. § 404.1563(d) (2012). Jackson has a high school

education and has received job training as an auto mechanic. He previously worked as a coal miner, a shuttle car operator, a corrections officer, and an automobile mechanic. Jackson has not engaged in substantial gainful activity since the alleged onset date of January 26, 2008. (R. at 19.)

Jackson has received regular medical treatment from Joshua Sutherland, D.O., since at least 2005, after Jackson presented with complaints of back and leg pain. (R. at 280.) In 2005, Dr. Sutherland performed an MRI on Jackson that revealed mild bulging discs from L3-S1 with no compromise of the neural canal or exit foramina at any level; the remainder of the MRI was unremarkable. (*Id.*) Dr. Sutherland prescribed Lortab and Ultram. (R. at 232.)

Jackson also complained to Dr. Sutherland of trouble sleeping. Dr. Sutherland referred Jackson to R.V. Mettu, M.D., FACP. Dr. Mettu conducted a sleep study on Jackson in June 2005, and diagnosed him with moderate obstructive sleep apnea. (R. at 239-241.) Following the sleep study, Dr. Mettu recommended that Jackson use a continuous positive airway pressure ("CPAP") mask. (R. at 240.) In November 2005, Dr. Mettu opined that Jackson's obstructive sleep apnea was corrected with the CPAP mask. (R. at 243.)

Despite the pain medication Dr. Sutherland prescribed in 2005, Jackson continued to complain of back and knee pain. (R. at 261-273.) Throughout 2005 and 2006, Dr. Sutherland acknowledged Jackson's complaints of pain and opined

that he suffered from tenderness and a decreased range of motion ("ROM") of the lumbar spine with sciatica and neuralgia of both legs, an occasional presence of muscle spasms, and had one occasion of an abnormal leg lift, but had normal examinations of the cervical and thoracic spines, arms, sensorium, deep tendon/reflexes, foot drop, and muscle guarding. (*Id.*) In addition, Dr. Sutherland frequently wrote that Jackson "has decreased range of motion in the lumbar spine in lifting, bending, stooping, and squatting and could not do lumbar flexion, extension, and rotation." (*Id.*)

In June 2006, Dr. Sutherland referred Jackson to Leonard Steward, Ph.D., to determine Jackson's level of mental functioning and personality patterns. (R. at 247.) Dr. Steward performed a psychological evaluation on Jackson in June and July 2006. The evaluation indicated that Jackson had a Full Scale IQ of 84, Verbal IQ Score of 91, and Performance IQ Score of 78. (R. at 251.) Dr. Steward opined that Jackson suffered from anxiety and depression. He also observed that Jackson demonstrated emotional conditions consistent with the symptoms of a chronic pain syndrome. (R. at 254.) Dr. Steward further opined that Jackson "appear[ed] permanently and totally disabled from any type of substantial gainful occupation currently available in the United States economic market on a sustained basis for at least a year or more." (*Id.*)

In January 2007, Jackson again complained to Dr. Sutherland of back and leg pain. Dr. Sutherland performed an X ray on Jackson which revealed facet syndrome and disc narrowing of the cervical spine from C4 to C6. (R. at 319.)

In September 2007, Jackson's attorney referred him to Teresa Jarrell, M.A., a licensed psychologist, to perform a psychological evaluation. (R. at 281.) Ms. Jarrell administered the Million Clinical Multiaxial Inventory ("MCMI-III"), Patient Pain Profile ("P-3"), Clinical Interview, and Mental Status Examination. (R. at 283-284.) The exams indicated that Jackson's immediate and recent memory was within normal limits, remote memory and concentration was mildly deficient, insight was moderately deficient, and judgment was mildly deficient. (R. at 284.) The evaluation also indicated significant elevations of anxiety and suggested depression. (*Id.*) Ms. Jarrell's evaluation also indicated that Jackson suffered from physical problems, pain, and health-related issues to the extent that they had a negative effect on his life. (R. at 286.) Jackson's Global Assessment of Functioning ("GAF") score was 50.[2] (R. at 287.) Ms. Jarrell concluded that

---

[2] A GAF score indicates an individual's overall level of functioning at the time of examination. It is made up of two components: symptom severity and social occupational functioning. A GAF score ranging from 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning; a GAF score ranging from 51 to 60 denotes functioning with moderate symptoms or moderate difficulty in social or occupational functioning; a GAF score ranging from 41 to 50 indicates functioning with serious symptoms or any serious impairment in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000).

Jackson was not capable of obtaining and sustaining meaningful gainful employment. (*Id.*)

Following the September 2007 evaluation, Ms. Jarrell completed a Medical Assessment of Ability to do Work Related Activities (Mental). Ms. Jarrell opined that Jackson's ability was poor to none to deal with work stresses, maintain attention and concentration, understand, remember and carry out complex and detailed job instructions, behave in an emotionally stable manner, relate predictably to social situations, and demonstrate reliability. (R. at 289-290.) Ms. Jarrell further opined that Jackson had fair ability to follow work rules, relate to co-workers, deal with public, use judgment with the public, interact with supervisors, function independently, understand, remember, and carry out simple job instructions, and maintain personal appearance. (R. at 290.)

Subsequently, in a February 2008 appointment, Dr. Sutherland opined that Jackson suffered from lumbar spine disc disease with diminished ROM, sciatica, neuralgia in both legs, chronic fatigue syndrome, and chronic pain syndrome. (R. at 318.) Dr. Sutherland prescribed Ultram and Lortab for Jackson's pain. (*Id.*) Dr. Sutherland also referred Jackson to Marsha Mead, Ph.D., a licensed professional counselor, for counseling "associated with dealing with complex medical and emotional disorder." (*Id.*)

Jackson met with Dr. Mead later that month and complained of depression, excessive worrying, and an increased temper. (R. at 302.) Dr. Mead initially diagnosed Jackson with dysthymic disorder and generalized anxiety disorder. (R. at 307.) Dr. Mead also opined that Jackson was moderately incapacitated due to Jackson's mental and physical condition. (R. at 298.) At a follow-up appointment on March 14, 2008, Dr. Mead administered the Beck Anxiety Inventory ("BAI") and Beck Depression Inventory II ("BDI-II") to Jackson. (R. at 299-301.) Dr. Mead's records indicate that Jackson scored in the severe range on both tests. (R. at 297.)

Jackson followed up with Dr. Sutherland on March 26, 2008. Dr. Sutherland performed an X ray on Jackson, which revealed increased lordosis of the cervical spine and degenerative disc disease of the cervical spine at C3 through C6. (R. at 315.) Dr. Sutherland noted that the X ray showed no evidence of any pathological fractures of the spine. (*Id.*) Jackson continued to meet with Dr. Sutherland on a monthly basis throughout the remainder of 2008, during which Dr. Sutherland prescribed various medications such as Lyrica, Naprosyn, Vicodin, and Cymbalta. (R. at 313, 385, 440-453.)

Jackson also continued to meet with Dr. Mead throughout 2008. Dr. Mead's evaluations revealed Jackson had a depressed and anxious mood, but was otherwise fully oriented, had an appropriate affect, normal speech, no

hallucinations, and had intact thought process, memory, judgment, and insight. (R. 295-297, 463-464.)

In October 2008, on referral from Dr. Sutherland, Jackson visited The Heart Center, a branch of Cardiovascular Associates, in Kingsport, Tennessee, for a stress test. (R. 418-419.) Jackson returned to The Heart Center on November 4, 2008, for a follow-up, during which Keith Kramer, M.D., reported an impression that Jackson suffered from hyperlipidemia, chronic fatigue/malaise, dizziness, atypical chest pain, smokeless tobacco abuse, hyptertension, sleep apnea, and coal mining exposure. (R. at 417.)

Jackson continued to follow-up with Dr. Mead throughout 2009. During Jackson's appointments, Dr. Mead continued to report a depressed and anxious mood, but psychological examinations were otherwise normal and revealed appropriate affect, normal speech, intact thought process, no hallucinations or suicidal ideations, and intact memory, judgment, and insight. (R. at 460, 456-458.) Jackson also reported difficulty sleeping on more than one occasion. (R. at 458-459.)

Jackson was also regularly seen by Dr. Sutherland through 2009 and 2010. Dr. Sutherland continued to indicate that Jackson suffered from lumbar disc disease and neuralgia, and later diagnosed Jackson with hypertension, hypothyroidism, and tendinitis of the left foot. (R. at 424-436, 524-529.) Dr.

Sutherland continued to prescribe Jackson medication, including Vicodin, Lortab, Ultram, and Darvocet. (R. at 426-436, 531-535.)

In addition, Dr. Sutherland completed a physical and mental assessment form in late 2009. Dr. Sutherland assessed Jackson's ability to deal with the public, use judgment with the public, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, understand, remember, and carryout complex and detailed job instructions, and demonstrate reliability as poor to none. (R. 420-421.) Dr. Sutherland opined that Jackson could occasionally lift 20 pounds and frequently lift 10 pounds, stand or walk for two hours out of an eight hour workday, and sit for three hours out of an eight hour workday. (R. at 422.) Dr. Sutherland further opined that Jackson could never climb, stoop, kneel, crouch, or crawl. (R. at 423.)

Ms. Jarrell performed another psychological evaluation of Jackson on January 26, 2010. Ms. Jarrell noted that Jackson was polite and cooperative and was oriented in all spheres. Ms. Jarrell's evaluation revealed that Jackson's immediate and recent memory were within normal limits, his remote memory and capacity for concentration were only mildly deficient, his judgment was only mildly deficient, his thought content was relevant, and his thought process was generally linear, but his insight appeared to be moderately deficient. (R. 512-522.)

Several state agency physicians evaluated Jackson's residual functional capacity ("RFC"). On July 23, 2008, Robert McGuffin, M.D., assessed Jackson's physical RFC. Dr. McGuffin reviewed Jackson's medical records and opined that Jackson could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds. (R. at 377.) Dr. McGuffin further opined that Jackson could stand or walk for six hours out of an eight hour workday, with normal breaks, and could sit for six hours out of an eight hour workday. (*Id.*) Dr. McGuffin also opined that Jackson could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. at 378.) Dr. McGuffin concluded that Jackson could perform light work with only occasional postural movements and occasional overhead reaching. (R. at 377-381.)

At the reconsideration level, Michael Hartman, M.D., also reviewed Jackson's medical records and evaluated his physical RFC on September 18, 2008. Dr. Hartman's evaluation mirrored Dr. McGuffin's evaluation. (R. at 392-396.)

On July 22, 2008, Richard Milan, Jr., Ph.D., a state agency psychologist, reviewed Jackson's medical records and evaluated Jackson's mental RFC. Dr. Milan observed that Jackson had moderate psychological symptoms that were managed with outpatient counseling and medications prescribed by a non-psychiatric source. (R. at 361.) Dr. Milan further noted that Jackson had not required psychiatric hospitalization or intensive psychiatric services, and noted that

he was not being treated by a psychiatrist. (*Id.*) Dr. Milan opined that Jackson retained the capacity for understanding and remembering simple instructions, concentrating, persisting at work duties, interacting appropriately with people, and adapting to changing activities within the workplace. (*Id.*) Dr. Milan concluded that Jackson was "capable of meeting the basic mental demands of competitive work on an ongoing basis, despite the limitations arising from his condition." (*Id.*)

At the reconsideration level, Howard Leizer, Ph.D., a state agency physician, also reviewed Jackson's medical records and evaluated his mental RFC on September 18, 2008. Dr. Leizer's evaluation mirrored Dr. Milan's evaluation. (R. at 412-414.)

At the hearing on February 9, 2010, Donald Anderson, an impartial VE, testified. The ALJ posed a hypothetical scenario in which he described an individual with the RFC to perform light work with some modifications. (R. at 60-61.) The VE indicated that a person of Jackson's age, education, and work experience, with the stated RFC, could not work Jackson's past jobs, but that such a person could perform several jobs that existed in significant numbers in the national economy, including a retail marker, cleaner, and folder. (R. at 61-62.)

The ALJ found that Jackson met the insured status requirements through December 31, 2011, had not engaged in substantial gainful activity since January 26, 2008, and had the severe impairments of obesity, chronic pain disorder

attributable to degenerative disc disease of the cervical and lumbar spines, obstructive sleep apnea depressive disorder, anxiety disorder, atypical cognitive disorder, and borderline intellectual functioning.  The ALJ also found that none of Jackson's impairments or combination of impairments met or medically equaled one of the listed impairments under Social Security Administration ("SSA") regulations.

The ALJ further found that Jackson's statements concerning his impairments and their impact on his ability to work were not entirely credible in light of the degree of medical treatment required, discrepancies between Jackson's assertions and information contained in the documentary reports, Jackson's medical history, the findings made on examination, Jackson's assertions concerning his ability to work, and the reports of the reviewing, treating and examining physicians.  The ALJ also rejected Drs. Sutherland, Steward, and Mead's and Ms. Jarrell's opinions, because they were considered "questionable and not fully credible."  (R. at 26-27.)

The ALJ also noted the existence of a prior ALJ decision regarding Jackson's disability status.  After reviewing the medical evidence, the ALJ determined that it would be appropriate to adopt the previous ALJ finding that Jackson had the RFC to perform light, unskilled work, with certain limitations.  The ALJ concluded that Jackson was unable to perform any past relevant work, but could perform several jobs that exist in significant numbers in the national

economy, and was therefore not disabled, as defined in the Act, from the alleged onset date through the date of the decision.

Following the ALJ decision, Jackson submitted additional evidence to the Appeals Council. The Appeals Council accepted three of these exhibits. The first exhibit included treatment notes from Dr. Mead, dated December 14, 2009. Dr. Mead indicated that Jackson was depressed and anxious, but was otherwise well groomed, cooperative, had appropriate affect and normal speech, was fully oriented, and had intact memory, judgment, and insight. (R. at 530.) Dr. Mead indicated that Jackson's treatment goals were to improve sleep and cope with anxiety about finances. (*Id.*)

The second exhibit contained treatment notes from Dr. Sutherland ranging from September 2009 through January 2010. Dr. Sutherland's notes are not very detailed, but they indicate that Jackson complained of back pain, hip pain, hand pain, and bowel issues. Dr. Sutherland assessed Jackson as having chronic fatigue syndrome, hemorrhoids, irritable bowel syndrome, epididymitis, right hand polyneuralgia, hypertension, hypothyroidism, and left foot lateral malleolus tendonitis. (R. at 531-536.)

The third exhibit contained treatment notes from Lawrence W. Bender, D.O., dated January 3, 2010. Jackson complained to Dr. Bender of fever, chills, and nausea. (R. at 537.) Dr. Bender noted impressions of prostatic gland

enlargement, pyelonephritis, and low back syndrome. (*Id.*) Dr. Bender prescribed a 14-day course of Levaquin and Pyridium. (R. at 538.)

Jackson contests the ALJ's decision, arguing that it is not supported by substantial evidence because the ALJ failed to properly evaluate the opinions of Dr. Sutherland, Dr. Mead, Dr. McGuffin, and Dr. Hartman. Jackson further argues that the ALJ improperly relied on prior findings from a different ALJ decision from January 25, 2008. Finally, Jackson argues that the additional evidence submitted to the Appeals Council after the ALJ's decision contradicts the ALJ's conclusion and was improperly disregarded by the Appeals Council.

The Commissioner argues that the ALJ fully considered the record and properly applied the law in determining that Jackson retained the RFC to perform work that existed in significant numbers in the national economy. The Commissioner contends that substantial evidence supports the ALJ's evaluation of the various medical opinions. The Commissioner further argues that the ALJ gave appropriate weight to the prior ALJ's RFC determination. Finally, the Commissioner argues that the Appeals Council properly disregarded the additional evidence.

III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. §§ 423(d)(2)(A).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or medically equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4) (2012). The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

I must review the denial of benefits under the Act to ensure that the ALJ's findings of fact "are supported by substantial evidence and [that] the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). I must not reweigh the evidence or make credibility determinations because those functions are left to the ALJ. *Johnson*, 434 F.3d at 653. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id*. (alteration in original) (internal quotation marks and citation omitted).

Jackson first argues that the ALJ failed to give proper weight to the opinions of Dr. Sutherland, Dr. Mead, Dr. McGuffin, and Dr. Hartman. An ALJ is required to weigh medical opinions based on: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. While "[c]ourts often accord greater weight to the testimony of a treating physician," *id.* (internal quotation marks and citation omitted), the ALJ is not required to do so "if a physician's opinion is not supported by clinical evidence or

if it is inconsistent with other substantial evidence." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ must "give good reasons in [the] notice of determination or decision for the weight [he or she] give[s] [the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2) (2012).

Here, the ALJ expressly stated that he gave no weight to Dr. Sutherland's opinion "due to the paucity of medical signs and laboratory findings contained in the objective medical record." The ALJ further observed that Dr. Sutherland's treatment notes revealed no significant abnormalities upon examination. While an examination by Dr. Sutherland revealed degenerative disc disease and narrowing at C3 through C6, there was no evidence of impingement, and an MRI revealed only mild disc bulging but was otherwise unremarkable. The ALJ also considered evidence regarding Jackson's course of treatment, and determined that it was not consistent with "what one would expect if the claimant was…truly disabled." In accordance with the regulations, the ALJ provided sufficient explanation for why he gave no weight to Dr. Sutherland's opinion. Accordingly, the ALJ was within his discretion in declining to afford Dr. Sutherland's opinion weight.

In regard to Dr. Mead's opinion, the ALJ stated that it failed for a lack of objective medical evidence. The ALJ considered Dr. Mead's evaluations from May 2008 and October 2009. The ALJ observed that Dr. Mead's evaluation

changed from a finding that Jackson had a fair to an unlimited ability to function to a finding of poor or no ability to function "without there being a significant change in the claimant's mental status examination." The ALJ is required to, among other things, examine the "the supportability of the physician's opinion." *See Johnson*, 434 F.3d at 654. Accordingly, there was substantial evidence to support a finding that Dr. Mead's evaluations were inconsistent and not supported by objective medical evidence, and therefore the ALJ was within his discretion in declining to afford Dr. Mead's opinion weight.

In regards to the opinions of Dr. McGuffin and Dr. Hartman, state agency physicians, Jackson argues that the ALJ improperly disregarded overhead reaching limitations that the two physicians identified after reviewing Jackson's medical record. The ALJ evaluated Dr. McGuffin and Dr. Hartman's opinions in light of the prior ALJ decision, Jackson's medical records, and Jackson's allegations regarding his symptoms. After considering this evidence, the ALJ afforded their opinions "some weight." (R. at 27.) The ALJ's evaluation of Dr. McGuffin and Dr. Hartman's opinions is supported by substantial evidence and in accordance with SSA regulations. *See* 20 C.F.R. 404.1527(d)(4) (2012) (providing that the more consistent a medical opinion is with the record as a whole, the more weight it will generally be given).

Next, Jackson argues that the ALJ improperly relied on prior findings from a different ALJ decision from January 25, 2008. In accordance with Social Security Acquiescence Ruling 00-1(4), "When adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim." *See Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999).

In this case, the ALJ adopted a 2008 finding by a different ALJ that Jackson was limited to a range of light, unskilled work. Jackson first argues that because the current ALJ found different severe impairments, reliance on the prior ALJ decision is improper. Second, Jackson argues that because the prior ALJ decision

was made before Dr. Mead's mental evaluation, reliance on that decision is improper. However, the existence of new severe impairments will not necessarily lead to a different RFC finding. Moreover, the ALJ declined to afford Dr. Mead's medical opinion weight, and as previously discussed, the ALJ's decision was in accordance with SSA regulations. It is clear that in adopting the prior ALJ's RFC determination of light, unskilled work, the ALJ comprehensively considered Jackson's medical records from the relevant period of time under consideration. The ALJ's adoption of the ALJ's RFC finding, in light of all relevant facts and circumstances, is supported by substantial evidence.

Jackson's final argument relates to additional evidence submitted to the Appeals Council following the ALJ's decision. On March 5, 2010, the ALJ denied Jackson's disability claim. Subsequently, on March 15, 2010, Jackson's attorney wrote to the Appeals Council, requesting review of the ALJ's decision and asking for a transcript of the ALJ hearing and copies of the medical evidence presented. Over a year and a half later, on December 9, 2011, the Appeals Council sent Jackson's attorney a CD of the record and informed him that he could submit within 25 days additional evidence that was new and material. At this point, Jackson submitted additional evidence to the Appeals Council. On February 28, 2012, the Appeals Council denied Jackson's request for review, and noted by Order of that date that three medical reports were made part of the record. The

three medical reports consisted of treatment notes submitted by Drs. Mead, Sutherland, and Bender.  In its decision, the Appeals Council said it reviewed the additional evidence noted in its Order, but said that it did not provide a basis for changing the ALJ's decision.

Thereafter on October 9, 2012, several months after the present case had been filed in this court, Jackson's attorney wrote to the Appeals Council on October 9, 2012, requesting that the Appeals Council reopen the February 28 decision or, in the alternative, prepare a supplemental certified record to include evidence submitted with the Request for Review, but which was not admitted into record.   Additionally, it appears that Jackson's attorney submitted additional evidence to the Appeals Council.  On December 6, 2012, the Appeals Council sent Jackson a letter, in which it declined to reopen the decision.  (Def.'s Brief, Ex. 1, ALJ Letter Dec. 6, 2012 (hereinafter "ALJ Letter").)   Moreover, the Appeals Council concluded that "[t]he evidence previously returned by the Appeals Council does not pertain to the period before the [ALJ] and was properly excluded from the record." (ALJ Letter.)  The Appeals Council also noted that Jackson had received a fully favorable DIB decision on November 2, 2012, based on an amended onset date of disability of March 6, 2010.

Jackson first argues that the evidence considered by the Appeals Council contradicts the ALJ's decision.  The Appeals Council, and this court, must consider

new and material evidence submitted after the ALJ's decision that is relevant to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.970(b) (2012); *see Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (holding that where Appeals Council considered additional evidence and incorporates it into the record, the reviewing court must also consider the new evidence as part of the record). This means that I must review the ALJ's decision in light of evidence that the ALJ never considered, *see Ridings v. Apfel*, 76 F. Supp. 2d 707, 709 (W.D. Va. 1999), while also refraining from making factual determinations, *McGinnis v. Astrue*, 709 F. Supp. 2d 468, 471 (W.D. Va. 2010). Therefore, my review of the new evidence is limited to determining whether it "is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports." *Davis v. Barnhart*, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005) (internal quotation marks and citations omitted). If the new evidence creates a conflict, then a remand is warranted so that the Commissioner can weigh and resolve the conflicting evidence. *Id.*

As stated, the Appeals Council considered three medical reports. Two of these reports consisted of treatment notes from Dr. Mead and Dr. Sutherland. These exhibits are largely cumulative of the evidence from Dr. Mead and Dr. Sutherland that the ALJ considered, and the credibility of those medical opinions would have been rejected for the same reasons that the ALJ rejected their other

opinions, namely because they are not supported by objective findings or Jackson's treatment history. The third exhibit consisted of treatment notes from Dr. Bender. Dr. Bender's notes suggest that Jackson suffered from low back syndrome, which might support Jackson's allegations that he is disabled due to back problems. However, Dr. Bender did not opine that Jackson's back problems were disabling, and Dr. Bender does not appear to have prescribed any treatment for Jackson's back problems. Therefore, I find that none of the evidence considered by the Appeals Council contradicts the ALJ's decision.

Jackson also argues that the evidence submitted to the Appeals Council, but which was returned to Jackson's attorney, contradicts the ALJ's decision. Pursuant to the sixth sentence of 42 U.S.C.A § 405(g) (West 2011), the court may "at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Therefore, if the additional evidence not considered by the Appeals Council would have been material to the Commissioner's decision, I could remand the case so that the Commissioner could weigh and resolve the conflicting evidence. *Id.* In this case, although Jackson has referenced and briefly described the additional evidence in his brief, Jackson has not submitted the evidence for me to consider. I therefore cannot find that a remand is warranted.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED:  July 22, 2013

/s/  James P. Jones
United States District Judge